## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,            )
                                     )
                    Plaintiff,       )
                                     )
v.                                   )        Case No. CR-22-00339-JD
                                     )
KENDRAY RASHEED JORDAN,              )
                                     )
                    Defendant.       )

## <u>ORDER</u>

The Second Amendment protects the right of individuals to possess a firearm for self-defense both inside and outside the home. When the government seeks to regulate conduct protected by the Second Amendment, it holds the burden of justifying the regulation by demonstrating that it is consistent with the United States' historical tradition of firearm regulation. Defendant Kendray Rasheed Jordan is charged in an Indictment [Doc. No. 1] with possessing a firearm while subject to a victim protective order in violation of 18 U.S.C. § 922(g)(8). Section 922(g)(8) prohibits any person who is subject to a domestic protective order from possessing a firearm in or affecting interstate commerce. Through his Motion [Doc. No. 16], Jordan argues that the Indictment must be dismissed because § 922(g)(8) is facially unconstitutional. The United States filed a Response [Doc. No. 20], arguing that § 922(g)(8) does not burden the Second Amendment's protection or, if it does, it does so consistently with the Nation's historical tradition of firearm regulation. Jordan filed a Reply [Doc. No. 27] providing further support for his Motion.

Because § 922(g)(8) is relevantly similar to historical firearm regulations, even though it regulates conduct protected by the Second Amendment, the Court finds that it is not facially unconstitutional.

## I.   <u>STANDARD OF DECISION</u>

Under Federal Rule of Criminal Procedure 12(b)(3), a defendant may challenge an indictment before trial where a "trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (citations omitted). Because Jordan asserts only a facial challenge to § 922(g)(8), the Motion may be properly decided as a matter of law before trial.[1]

## II.   <u>DISCUSSION</u>

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The statute Jordan is indicted under and at issue here, 18 U.S.C. § 922(g)(8), provides:

(g) It shall be unlawful for any person—
. . .
(8) who is subject to a court order that—

(A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;

(B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place

---

[1] Both parties agree a hearing is not required or necessary on the Motion.

2

an intimate partner in reasonable fear of bodily injury to the partner or child; and

(C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

(ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury . . . ,

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Before the recent Supreme Court decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), "the Courts of Appeals," including the Tenth Circuit, had "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Id.* at 2125; *see United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010) (utilizing such an approach to reject an as-applied Second Amendment challenge to § 922(g)(8)); *Peterson v. Martinez*, 707 F.3d 1197, 1208 (10th Cir. 2013) ("First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If the law does not impose a burden, it is constitutional. If it does, then the court must evaluate the law under some form of means-end scrutiny." (citations omitted)).

In *Bruen*, the Court disavowed that approach and adopted a new standard for analyzing Second Amendment challenges. The Court set out the following standard:

[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation

3

promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 142 S. Ct. at 2126 (citation omitted) (footnote omitted).[2]

---

[2] The Court has been able to identify only one district court order addressing a Second Amendment challenge to § 922(g)(8) under *Bruen*, an order from this district's Chief Judge in *United States v. Kays*, No. CR-22-40-D, 2022 WL 3718519 (W.D. Okla. Aug. 29, 2022), which found that § 922(g)(8) passes constitutional muster. Further, as of its drafting of this Order, the Court has been able to identify only two district court orders that have declared a subsection of § 922 unconstitutional under *Bruen*. *See United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022) (§ 922(n)); *United States v. Price*, No. 2:22-CR-00097, 2022 WL 6968457 (S.D. W.Va. Oct. 12, 2022) (§ 922(k)). Many courts have rejected challenges to various subsections in § 922 under *Bruen*, most often challenges to the felon in possession statute, § 922(g)(1). *See United States v. Jackson*, No. CR-22-59-D, 2022 WL 3582504 (W.D. Okla. Aug. 19, 2022); *United States v. Campbell*, No. CR-22-138-HE [Doc. No. 64] (W.D. Okla. Sept. 27, 2020); *see also United States v. Coombes*, No. 22-CR-00189-GKF, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022); *United States v. Carrero*, No. 2:22-CR-00030, 2022 WL 9348792 (D. Utah Oct. 14, 2022); *United States v. Daniels*, No. 1:22-CR-58-LG-RHWR-1, 2022 WL 2654232 (S.D. Miss. July 8, 2022); *United States v. Ingram*, No. CR 0:18-557-MGL-3, 2022 WL 3691350 (D.S.C. Aug. 25, 2022); *United States v. Nutter*, No. 2:21-CR-00142, 2022 WL 3718518 (S.D. W.Va. Aug. 29, 2022); *United States v. Burrell*, No. 21-20395, 2022 WL 4096865 (E.D. Mich. Sept. 7, 2022); *United States v. Cockerham*, No. 5:21-CR-6-DCB-FKB, 2022 WL 4229314 (S.D. Miss. Sept. 13, 2022); *United States v. Jackson*, No. CR 21-51 (DWF/TNL), 2022 WL 4226229 (D. Minn. Sept. 13, 2022); *United States v. Hill*, No. 21CR107 WQH, 2022 WL 4361917 (S.D. Cal. Sept. 20, 2022); *United States v. Collette*, No. MO:22-CR-00141-DC, 2022 WL 4476790 (W.D. Tex. Sept. 25, 2022); *United States v. Siddoway*, No. 1:21-CR-00205-BLW, 2022 WL 4482739 (D. Idaho Sept. 27, 2022); *United States v. Seiwert*, No. 20 CR 443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022); *United States v. Charles*, No. MO:22-CR-00154-DC, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022); *United States v. Riley*, No. 1:22-CR-163 (RDA), 2022 WL 7610264 (E.D. Va. Oct. 13, 2022); *United States v. Anderson*, No. 2:21CR00013, 2022 WL 10208253 (W.D. Va. Oct. 17, 2022); *United States v. Minter*, No. 3:22-CR-135, 2022 WL 10662252 (M.D. Pa. Oct. 18, 2022).

Defendant argues that § 922(g)(8) is a facially unconstitutional regulation of conduct protected by the Second Amendment.[3] The government contends that Jordan's facial challenge must fail because § 922(g)(8) applies to persons who fall outside of the Second Amendment's protection. The government then argues that if § 922(g)(8) does regulate conduct protected by the Second Amendment, it does so consistently with historical tradition of firearm regulation.

A.    **Section 922(g)(8) regulates conduct protected by the Second Amendment.**

In *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court explained that the Second Amendment "protect[s] the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense" and "an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 142 S. Ct. at 2122. The government thus argues that laws regulating possession of firearms by "irresponsible, non-law-abiding persons" do not implicate the Second Amendment.

As instructed in *Bruen*, the Court looks to the Second Amendment's plain text to answer the question of whether § 922(g)(8) regulates conduct protected by the Second Amendment. *Id.* at 2126. For the sake of clarity of the Court's textual analysis, it will restate the text of the Second Amendment: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The phrase most relevant to answering this question is "right of the people."

---

[3] There is no dispute that Jordan falls within the scope of § 922(g)(8), and he does not, at this time, challenge the statute as applied to him.

5

The Constitution does not define "right of the people," but the phrase also appears in the First[4] and Fourth[5] Amendments. U.S. Const. amends. I, IV. In *Heller*, the Court noted that the Ninth Amendment[6] "uses very similar terminology." 554 U.S. at 579. The rights conferred by these amendments generally are not stripped from individuals solely on the basis of their status as "irresponsible, non-law-abiding persons." *See United States v. Coombes*, No. 22-CR-00189-GKF, 2022 WL 4367056, at *3–4 (N.D. Okla. Sept. 21, 2022) (reasoning, upon a challenge to the constitutionality of 18 U.S.C. § 922(g)(1), that since convicted felons enjoy First and Fourth Amendment rights, they should not be carved out from the scope of the Second Amendment's protection of "the people"); *cf. McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (rejecting the call to treat the Second Amendment right as "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees").

---

[4] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the *right of the people* peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I (emphasis added).

[5] "The *right of the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV (emphasis added).

[6] "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX.

The Court in *Heller* analyzed the uses of "the people" in the Constitution to answer the question of whether the Second Amendment conferred a right to individuals. 554 U.S. at 579–81.

> "'[T]he people' seems to have been a term of art employed in select parts of the Constitution . . . . [Its uses] sugges[t] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."

*Id.* at 580 (quoting *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)). The Court, therefore, began its analysis of the Second Amendment claim in *Heller* "with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581.

Without an answer from a higher court to the specific question raised here (whether entry of a victim protective order against an individual pulls them outside the meaning of "the people"), the government faces a steep uphill climb to overcome this "strong presumption," which is gleaned from the Second Amendment's plain text. Notably, the government fails to make a single textually based argument toward this end. Instead, it relies entirely on the "ordinary," "law-abiding," and "responsible" characterizations of the Second Amendment protection from *Bruen* and *Heller*. But without any textually based reason, the Court finds that it cannot follow the government down this path.

Therefore, consistent with the "strong presumption" identified in *Heller*, the Court finds that the Second Amendment's plain text covers the conduct proscribed by

§ 922(g)(8), which is the possession of firearms for lawful purposes, such as self-defense, by individuals subject to a victim protective order.[7] Accordingly, § 922(g)(8) regulates conduct presumptively protected by the Second Amendment. *Bruen*, 142 S. Ct. at 2129–30.

**B.      The government meets its burden to demonstrate that § 922(g)(8) regulates possession of firearms consistently with this Nation's historical tradition of firearm regulation.**

Having found that the conduct regulated by § 922(g)(8) is covered by the Second Amendment's plain text, the Court turns to whether the government has met its burden by demonstrating that § 922(g)(8) "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

To assess whether the government meets this burden, the Court considers "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.* at 2131–32 (citing *Heller*, 554 U.S. at 631). The Court in *Bruen* explained that this "'[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it.'" *Id.* at 2130 (quoting *McDonald*, 561 U.S. at 803–04 (Scalia, J., concurring)).

---

[7] Additionally, although the two-step framework employed by the Tenth Circuit was abrogated by *Bruen*, the circuit previously recognized the scope of the Second Amendment covers alleged offenders under § 922(g)(8). *Cf. Reese*, 627 F.3d at 801 ("[T]here is little doubt that the challenged law, § 922(g)(8), imposes a burden on conduct, i.e., [the defendant's] possession of otherwise legal firearms, that generally falls within the scope of the right guaranteed by the Second Amendment."), *abrogated by Bruen*, 142 S. Ct. at 2126 (declining to adopt the two-part approach employed by the Tenth Circuit).

In some circumstances, this analysis may require the use of "historical analogies," whether because of "unprecedented societal concerns or dramatic technological changes." *Id.* at 2132. Thus, "[w]hen confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.* "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 2133.

Whether a modern regulation is analogous enough depends on whether it is "relevantly similar" to the historical analogue. *Id.* at 2132–33. Although the Court did not provide an exhaustive list of considerations for this inquiry, it did instruct courts to look to two metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. These metrics assess "whether modern and historical regulations impose a comparable burden" on Second Amendment rights "and whether that burden is comparably justified," which are "'*central*' considerations when engaging in an analogical inquiry." *Id.* (quoting *McDonald*, 561 U.S. at 767).

As demonstrated by Jordan, societal attitude toward domestic violence has changed significantly since 1791. Motion at 5–6; Reply at 13–14.[8] Section 922(g)(8) thus, in some respect, addresses a modern societal concern such that the government may carry its burden by pointing to historical analogues that are relevantly similar to § 922(g)(8). *See Bruen*, 142 S. Ct. at 2132 ("Fortunately, the Founders created a Constitution—and a Second Amendment—'intended to endure for ages to come, and

---

[8] The Court uses ECF page numbering.

consequently, to be adapted to the various crises of human affairs.'" (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 415 (1819))). Jordan points out that the founding generation may never have attempted to address the problem of domestic abuse and that it surely did not seek to address it by prohibiting the possession of firearms. The government does not contend otherwise. But that the founding generation did not seek to address domestic violence by prohibiting the possession of firearms, or even at all, does not necessarily mean that there is no historical analogue for § 922(g)(8).

The government provides minimally sufficient historical support to demonstrate § 922(g)(8) is relevantly similar to historical regulations and thus consistent with this Nation's tradition of firearm regulation. The government points to two types of historical regulations: (1) laws generally "disarming dangerous persons" and (2) "surety laws that limited firearm possession based on a credible threat of harm." Response at 13.

Though presented in a rather generalized manner, the historical evidence discussed by the government in its Response demonstrates a tradition in the United States of disarming dangerous citizens.[9] The government mentions specifically Seventeenth Century English practices of disarming individuals deemed by the government as dangerous, *see* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wy. L. Rev. 249, 262 (2020) ("Americans continued some English arms traditions, including the tradition

---

[9] To be sure, the Court declined above to find that these individuals are excluded from the plain text of "the right of the people" in the Second Amendment. But whether possession of firearms by dangerous citizens has been prohibited by historical regulations is a separate question.

of disarming those perceived as dangerous."), and proposals made at the Pennsylvania and Massachusetts Ratifying Conventions that would explicitly permit laws designed to disarm dangerous persons. Response at 13–14.

A proposal by Samuel Adams at the Massachusetts Ratifying Convention would have kept Congress from preventing "'the people of the United States, *who are peaceable citizens*, from keeping their own arms.'" *United States v. Bena*, 664 F.3d 1180, 1183–84 (8th Cir. 2011) (quoting Journal of Convention: Wednesday February 6, 1788, *reprinted in Debates and Proceedings in the Convention of the Commonwealth of Massachusetts Held in the Year 1788*, at 86 (Boston, William White 1856)) (emphasis added in *Bena*).

Pennsylvania delegates advocated a similar constraint on Congress in the form of "a constitutional provision stating that 'no law shall be passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals*.'" *Id.* at 1184 (quoting The Address and Reasons of Dissent of the Minority of the Convention of Pennsylvania to their Constituents, *reprinted in* Bernard Schwartz, 2 *The Bill of Rights: A Documentary History* 662, 665 (1971)) (emphasis added in *Bena*). The Court in *Heller* viewed this proposal as "highly influential," 554 U.S. at 604, "likely because 'it represents the view of the Anti-federalists—the folk advocating for very limited federal power, opposing the Constitution generally, but advocating for a strong Bill of Rights. Even these advocates of broad individual and state rights viewed the right to possess and carry arms as limited—particularly from those who had committed crimes or were a danger to the public.'" *Coombes*, 2022 WL 4367056, at *6 (quoting *United States v. Tooley*, 717 F. Supp. 2d 580, 590 (S.D. W.Va. 2010)). "[A]lthough some

11

scholars have pointed out that the Second Amendment as ratified did not explicitly limit the right to virtuous or peaceable persons or exclude felons," as the Massachusetts and Pennsylvania proposals would have, "other scholars have suggested that no objection was made because the exclusions were understood." *Id.* at *7 (citation omitted).

Further, the surety statutes presented by the government as historical analogues are relevantly similar to § 922(g)(8). These surety statutes generally required individuals, upon a finding that they were "reasonably likely to breach the peace," to post a bond to carry a weapon in public. *Bruen*, 142 S. Ct. at 2148. After "an individual was reasonably accused of intending to injure another or breach the peace," these laws required them to either (1) post money that would be forfeited if they breached the peace or injured others or (2) show special need, such as a need for self-defense, to avoid the fee. *Id.* at 2148–49.

The New York law at issue in *Bruen* required those seeking a license to carry a firearm in public for self-defense to show "proper cause" to obtain the license; New York courts required those individuals to "demonstrate special need for self-protection distinguishable from that of the general community." *Id.* at 2122–23. The Court declined to find the surety statutes analogous to the New York public carry licensing law because the surety statutes "were not *bans* on public carry, and they typically targeted only those threatening to do harm." 142 S. Ct. at 2148. "While New York presumes that individuals have *no* public carry right without a showing of heightened need, the surety statutes *presumed* that individuals had a right to public carry that could be burdened only if another could make out a specific showing of 'reasonable cause to fear an injury, or

breach of the peace.'" *Id.* (quoting Mass. Rev. Stat., ch. 134, § 16 (1836)) (emphasis in *Bruen*).

Unlike the New York law in *Bruen*, § 922(g)(8) is analogous enough to the surety laws to pass constitutional muster. The surety laws applied to an individual only after they had been reasonably accused of intending to injure another or breach the peace; § 922(g)(8) applies to individuals who, after a hearing at which they had an opportunity to participate, are subject to a protective order that either (1) includes a finding that they present a credible threat to another's physical safety or (2) prohibits them from use, or attempted use, of physical force to cause bodily injury against another. Further, like the surety laws, which applied for a term of up to six months, Mass. Rev. Stat., ch. 134, § 16 (1836), § 922(g)(8) restricts an individual's right to possess firearms only while they are subject to the underlying protective order.[10] Thus, § 922(g)(8), like the surety statutes, operates to restrict the rights of a discrete category of potentially dangerous individuals for a limited period of time to prevent violent use of firearms. These laws are relevantly similar and analogous enough for § 922(g)(8) to pass constitutional muster.

Granted, the government has been unable, through these surety laws and other historical precursors, to present a "historical twin" or show § 922(g)(8) is a "dead ringer" for any historical precursor. There are real differences between the surety statutes and § 922(g)(8), particularly in the means of enforcement; the surety statutes did not proscribe possession like § 922(g)(8) does. But the historical analogues and other

---

[10] Here, Jordan was subject to a five-year protective order. [Doc. No. 16-2 at 3].

evidence provided by the government are minimally sufficient for our purposes here. Section 922(g)(8) is similar enough to the historical precursors identified by the government to pass constitutional muster. The government, therefore, has met its burden to show it is consistent with this Nation's tradition of firearm regulation.

## III.   <u>CONCLUSION</u>

Based upon application of *Bruen*—but without the benefit of application of *Bruen* in this context by a higher court—the Court declines to declare § 922(g)(8) (prohibiting any person subject to a protective order for domestic violence from possession) facially unconstitutional under the Second Amendment. The Court therefore DENIES Defendant Kendray Rasheed Jordan's Motion to Dismiss the Indictment based on the Unconstitutionality of 18 U.S.C. § 922(g)(8) [Doc. No. 16].

IT IS SO ORDERED this 25th day of October 2022.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE